IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 10, 2004 Session

## ROBERT GENTRY GALBREATH v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Bedford County**
**No. 9562     Lee Russell, Judge**

---

**No. M2003-02807-CCA-R3-PC - Filed January 19, 2005**

---

The Petitioner, Robert Gentry Galbreath, was convicted by a jury of twelve counts of obtaining a prescription drug by fraud.  The trial court sentenced the Petitioner to thirty-six years, as a career offender at sixty percent. On direct appeal, this Court affirmed the Petitioner's convictions and sentence.  The Petitioner filed a petition for post-conviction relief, which the post-conviction court dismissed.  The Petitioner now appeals, contending that the post-conviction court erred because: (1) the trial court improperly failed to instruct the jury on the lesser-included offense of facilitation; (2) his trial counsel was ineffective; (3) his appellate counsel was ineffective; and (4) his sentence amounts to cruel and unusual punishment. Because we have concluded that the Petitioner's counsel was ineffective at trial and on appeal, for failing to request a jury instruction on the lesser-included offense of facilitation and failing to appeal the jury instruction issue; we reverse the post-conviction court's dismissal of the Petitioner's petition for post-conviction relief, reverse the original convictions, and remand for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed and Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and NORMA MCGEE OGLE, J., joined.

Richard McGee and Jodie A. Bell, Nashville, Tennessee, for the Appellant, Robert Gentry Galbreath.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; William M. McCown, District Attorney General; and Michael D. Randles, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**I. Facts**

The Petitioner, Robert Gentry Galbreath, appeals the post-conviction court's dismissal of his petition for post-conviction relief. The evidence presented at trial, as summarized on direct appeal, is as follows:

> On September 7, 2000, Eckerd's pharmacist Chris Crafford received a message from a Dr. Barry Beck in Nashville calling in a prescription for a Terry Sanders. The call-in prescription was for Hydrocodone. Since Crafford was unfamiliar with Dr. Beck, he called Dr. Beck's office to verify the prescription. Dr. Beck was not in at the time; however, a nurse in his office told Crafford that Terry Sanders was not a patient of Dr. Beck's. Later, Dr. Beck called Crafford and confirmed that he did not call in such a prescription. Crafford then called Agent Thomas Biele of the 17th Judicial District Drug Task Force and told him that someone posing as Dr. Beck had called in a prescription. Agent Biele told Crafford to fill the prescription and to call him as soon as someone attempted to pick it up.
>
> The next day, Agent Biele received a call that someone was in the store to pick up the prescription. Agent Biele immediately went to the store. The clerk who had called Agent Biele gave Biele a physical description of the person picking up the prescription. Agent Biele saw the Defendant pay for and receive the prescription. Agent Biele then followed the Defendant outside, observed the Defendant take the prescription bottle out of the bag, and observed the Defendant attempt to throw away the bag. Agent Biele asked the Defendant for the crumpled white bag and identified himself as an agent for the 17th Judicial District Drug Task Force. Agent Biele then asked the Defendant for identification, and the Defendant replied that he did not have any. Agent Biele searched the Defendant and found pieces of paper on the Defendant's person on which were written the names and Drug Enforcement Agency (DEA) numbers[1] of Dr. Beck and another physician, Dr. Mack, as well as the names and phone numbers of Terry Sanders and Kevin Green. The Defendant then identified himself as Robert Galbreath from Columbia, Tennessee and stated that the agent "had him" and that he would fully cooperate.
>
> The Defendant was arrested and transported to the police station where he was read his Miranda rights before being interrogated. The Defendant agreed to talk to police and signed a waiver of his rights. The Defendant informed Agent Biele that he had fraudulently obtained prescription drugs at Eckerd's on previous occasions, using three different names: Terry Sanders, Kevin Green, and Tammy Stewart.

---

[1]Chris Crafford testified that DEA numbers are identification numbers assigned by the federal government to doctors, permitting them to legally prescribe controlled substances.

According to the Defendant, to obtain fraudulent prescriptions, he went to doctors' offices, copied their DEA numbers off of prescription pads, and then called pharmacies using these numbers. Agent Biele checked the phone numbers for the names written on the pieces of paper found on the Defendant's person and discovered that the numbers did not correspond to the doctors' names. Agent Biele then returned to the Eckerd's store and requested data sheets on the names provided by the Defendant. Agent Biele found twelve prescriptions prescribed by Dr. Beck and Dr. Mack for Terry Sanders, Kevin Green, and Tammy Stewart. They were prescribed on August 15, 17, 19, 22, 23, 26, 27, 29, and 30, as well as on September 1, 2, and 8, 2000. Dr. Beck and Dr. Mack confirmed by phone and by letter that none of the three individuals were their patients.

Following the trial, a sentencing hearing was held on August 2, 2001. Certified and uncertified copies of seven convictions for forgery, ten convictions for passing forged instruments and one conviction for criminal attempt were offered into evidence. The Defendant admitted to attempting to smuggle drugs into jail on more than one occasion. He also admitted that his probation had been revoked on more than one occasion. At the time of the sentencing hearing, the Defendant had twelve other prescription fraud charges in another county pending against him, for which he was out on bond. The Defendant was also on supervised probation for another fraudulent prescription charge when he committed the crimes in the instant case.

The trial court sentenced the Defendant to twelve years on each count, with counts 1-4 running concurrently, counts 5-8 running concurrently, and counts 9-12 running concurrently. Each of the three sets of sentences, counts 1-4, counts 5-8, and counts 9-12, were to run consecutively with each other. The Defendant thus received an effective sentence of thirty-six years. The Defendant also received a fine of $2,000 on each count.

State v. Robert Gentry Galbreath, No. M2001-02495-CCA-R3-CD, 2002 WL 1732356, at *1–2 (Tenn. Crim. App., at Nashville, July 26, 2002).

On July 18, 2003, the Petitioner filed a petition for post-conviction relief. At the post-conviction hearing, the following evidence was presented:

The Petitioner's trial counsel, Richard M. Dugger ("Counsel"), testified that he had been in the legal profession since 1979, during which time he had been an assistant district attorney, a city attorney, a general sessions judge and a criminal defense attorney. Counsel was retained by the Petitioner on April 2, 2000, and Counsel was present at the Petitioner's arraignment on April 5, 2000. Counsel could not state, and refused to estimate, how many times he met with the Petitioner or how much time he spent preparing for the Petitioner's defense, but stated that he met with the Petitioner and his family enough to understand the Petitioner's side of the case and to convey the

State's theories to the Petitioner. Counsel testified that he informed the Petitioner of the State's plea offer of forty-eight years, which the Petitioner refused, counter-offering twelve years, which the State refused.

Counsel testified that he interviewed Agent Biele;[2] however, he was unable to produce any notes or records about the interview, but said that Agent Biele informed him about the Petitioner's case. Counsel explained that he believed that Agent Biele would not have been as free with information if Counsel had taken notes. Counsel testified that he spoke with someone from the office of the two doctors whose names and DEA numbers the Petitioner used to obtain prescriptions; however, Counsel did not remember with whom he spoke or when he had spoken with them. Counsel testified that he did not interview Becky Dean or Officer Tony Collins, two witnesses on the State's witness list. Counsel said he had no notes or records of any interviews with witnesses or research regarding the Petitioner's case. Counsel testified that he did not remember whether he interviewed any other witnesses listed on the State's witness list, but did not believe he had. Counsel explained, however, that he did research the legal issues of the Petitioner's case.

Counsel testified that his office looked into the existence of "Terry Sanders" and discovered that there were numerous "Terry Sanders" in Tennessee. Counsel explained that he relied on the Petitioner to provide him with "a specific name" of the particular Terry Sanders that the Petitioner said that he knew and said that was involved in this crime. Counsel testified that he did not request a preliminary hearing tape because the Petitioner waived his preliminary hearing. Further, he testified that he did not file a motion to suppress the slips of paper taken from the Petitioner because he did not see any legal basis for the suppression of this evidence. Similarly, Counsel said, he did not file a motion to suppress the Petitioner's statement to Agent Biele because he believed there was no legal basis for this argument. Counsel testified that he decided not to file a motion to sever the twelve counts of the indictment, because, based on his understanding of the law, the trial court would not have granted the severance. Counsel explained that this decision was a trial tactic; the strategy was to concede guilt on the twelfth count in order to lend credibility to the Petitioner's claims of innocence on the other eleven counts.[3] Counsel conceded that the jury's finding the Petitioner a credible witness was unlikely because juries often find drug officers credible witnesses. Counsel testified that he did not request Jenks material at trial, even though there were redacted portions of Agent Biele's report, which was provided in discovery and used at trial. Counsel noted that Jenks material is important to cross-examination of a witness, and, although he did not remember, it was probable that he discussed the redacted portions of the statement with the State before trial.

Counsel testified that he did not request a jury instruction on the lesser-included charge of

---

[2]In the post-conviction hearing transcript Agent Biele's name is spelled "Beale," however, for clarity and consistency, we will use the spelling of the name used in the trial transcript.

[3]Later in the proceedings of this case, the Petitioner and Counsel contradicted this number, stating that the Petitioner admitted guilt to "one or two" and then "two" counts.

facilitation. He said that he also did not request community corrections because, in Bedford County, the trial court considers community corrections automatically. Counsel said that he did not remember whether he spoke to the Petitioner's probation officer from Maury County before the sentencing hearing, but he was aware of the probation officer and what his testimony could be.[4] He testified that he was aware of the Petitioner's extensive criminal record, drug addiction, failed prior attempts at rehabilitation, and the charges pending against Petitioner in Maury County. He said that, in his experience, the trial court would not grant community corrections under these circumstances.

Counsel testified that he explained to the Petitioner both the positive and negative aspects of testifying at trial, in light of the possibility of the State's impeaching the Petitioner with his prior felony record. Counsel explained that he informed the Petitioner that it was ultimately the Petitioner's decision whether to testify. Counsel testified that, although he did not actually remember the conversation, if there was any reference to a coin toss it would have been about how the jury would react to the Petitioner's testimony, and not the ultimate decision of whether the Petitioner would testify. Further, Counsel explained that, if he actually flipped a coin, "it would have been to make a point, not to make a decision."

Brenda Ann Edsinger, the Petitioner's first cousin, testified that she was present at the sentencing hearing and was willing to testify. Edsinger testified that had Counsel called her to testify at the sentencing hearing, she would have testified that, before the Petitioner's incarceration, he was working as a truck driver and had come through town and stopped at her place of work. Edsinger said that she noticed then that the Petitioner looked sick, and after the Petitioner began treatment for his illness, he was doing better. Edsinger stated that she also would have testified that she had visited the Petitioner at one point, and they prayed together and discussed the Petitioner's ongoing struggle with drug addiction. Edsinger testified that the Petitioner was making progress before he was incarcerated, his physical appearance had improved and he had maintained employment. She said that Counsel did not discuss anything with her before the Petitioner's sentencing hearing, nor did he call her to testify. Edsinger testified that she would have told the trial court that the Petitioner was not a violent man, but that he was a good person who needed counseling and treatment for his drug addiction.

Connie Lynn Greene, the Petitioner's sister, testified that she was present at the sentencing hearing and, although Counsel did not call her as a witness, she was willing to testify. Greene said that, had she been asked, she would have testified that she saw the Petitioner about once a week prior to his sentencing and incarceration. Greene would have testified that the Petitioner was living with his wife at that time and had a good relationship with his family, and attended family gatherings and vacations. Greene stated that she would have told the court the Petitioner did not appear to be using drugs at that time. Further, she would have explained that the Petitioner had been working and helping with his stepson's homework and school activities. Greene would have testified that the Petitioner had been doing well in his rehabilitation, and, in her opinion, would continue to do well

---

[4]The transcript of the sentencing hearing, however, reflects that Counsel was in contact with the Petitioner's probation officer.

despite his previous failures. Greene explained that, had she been asked to testify, she would have additionally said that her brother needed counseling, not prison.

Robert Galbreath, Sr., the Petitioner's father, testified that he was present at the sentencing hearing and would have testified, had Counsel asked. He said that he would have testified that he and the Petitioner's mother divorced when the Petitioner was eleven or twelve years old, and that the divorce upset the Petitioner. Galbreath explained that, although the Petitioner resided with his mother after the divorce, Galbreath maintained a close relationship with the Petitioner. Galbreath said that he would have told the court that he first became aware of the Petitioner's drug abuse when the Petitioner was in his early twenties, and the Petitioner wrote some checks on Galbreath's account. Galbreath would have testified that prior to the Petitioner's sentencing, the Petitioner was doing well in treatment and holding down a job. Galbreath explained that he saw the Petitioner once a week before the Petitioner went to jail, and the Petitioner was happy and had a good relationship with his family.

Charles William Burt, the Petitioner's step-father, testified that he, the Petitioner's mother, wife, cousin, father, and sister were all present at the sentencing hearing and were all willing to testify, had Counsel asked. Burt testified that he would have told the court that he and the Petitioner's mother had been married for twenty-five years, and the Petitioner had lived with them while he was growing up. Burt also would have testified that he had a good relationship with the Petitioner, and while the Petitioner was out on bond, he had maintained contact with the Petitioner. Burt stated that, had he testified, he would have said that when the Petitioner was out on bond and living at the Place of Hope rehabilitation facility, Burt would stop by to see the Petitioner. Burt testified that he would have said that the Petitioner was doing well with his treatment and, although he had witnessed the Petitioner's unsuccessful attempts at rehabilitation before, this time the Petitioner seemed likely to be successful, in part because he seemed more positive and upbeat. Burt stated, "I could tell a difference in him, his attitude, and he was working." Burt testified that, at the time of sentencing, the Petitioner was living with his wife and step-son and had a good relationship with them. Burt felt that the Petitioner would have been successful if he had been given some sort of supervised probation or community corrections.

Additionally, Burt testified that he was present when the Petitioner hired Counsel. Burt testified that he drove the Petitioner to meetings at Counsel's office on three or four occasions, and these meetings usually lasted about thirty minutes. Burt said that he was in the room when Counsel and the Petitioner discussed the case, and he did not hear any discussions of trial strategy, only discussions about trials in general. Burt stated that he was present when Counsel and the Petitioner discussed whether or not the Petitioner would testify. Burt recalled that this conversation took place in the back of a small courtroom, and he explained that Counsel informed the Petitioner of the State's ability to introduce the Petitioner's prior convictions if the Petitioner testified. Burt said that the Petitioner was leaning towards testifying and Counsel was leaning against it. Burt testified, "[I]t ended up, a coin toss was made, and [the Petitioner] lost the coin toss." Burt explained that, although the Petitioner agreed to be bound by Counsel's coin toss, the Petitioner understood that he was not prohibited from testifying based on that result. Burt explained that the Petitioner "could

have insisted and he would have been allowed [to testify], I'm sure."

The Petitioner testified that he was serving a sentence of thirty-six years at sixty percent, as a career offender, for twelve counts of obtaining a prescription by fraud. The Petitioner testified that he was unsure about the date, but that he hired Counsel around February or March of 2001. The Petitioner testified that his second meeting with Counsel was at Counsel's office, and he met with Counsel a total of three or four times. The Petitioner said that, during his second meeting with Counsel, he informed Counsel of the details surrounding his arrest and that he was in treatment for drug addiction. The Petitioner testified that he recounted the events of his arrest to Counsel, which were similar to the facts found by the jury at trial. Additionally, the Petitioner testified that he explained to Counsel that he informed Agent Biele that Terry Sanders had dropped the Petitioner off to pick up the prescription while Sanders went down the street to pick up lunch.

The Petitioner testified that he told Counsel that he had taken seven or eight pills on the morning that he was arrested, but told him that he was not very high on the pills when he spoke to Agent Biele. The Petitioner testified that he informed Counsel that he and Agent Biele discussed their respective children and the effect that drugs were having on the petitioner's life, and that Agent Biele told the Petitioner that he would help the Petitioner if the Petitioner helped him. The Petitioner testified that he informed Counsel that one reason he wanted to testify was to explain to the jury what he had discussed with Agent Biele and that he had the names and addresses on the slips of paper because a pharmacy will often ask for this information when prescriptions are picked up.

The Petitioner testified that he informed Counsel that he told Agent Biele he obtained the DEA numbers from Sanders, not from the doctors' prescription pads as Agent Biele testified. The Petitioner testified that he never said that he had called in the prescriptions to determine whether or not the pharmacist would "fall for it." The Petitioner testified that he told Counsel that he informed Agent Biele that he had picked up two prescriptions from Eckerd's, not that he had called in phony prescriptions "numerous" times. The Petitioner testified that Agent Biele either accidently or intentionally misrepresented the Petitioner's story in his statement and testimony at trial.

The Petitioner testified that Counsel was unsure what evidence the State had against him, other than the slips of paper and pill bottle taken from him at the time of his arrest. The Petitioner testified that Counsel discussed the possibility of jail time, but that Counsel believed he could get the Petitioner three to six years probation. He said that, until the day of trial, Counsel never discussed having any further knowledge of additional evidence against him. The Petitioner explained that, during his meetings with Counsel, they would discuss Counsel's boat, other cases, and "other things really other than we were supposed to talk about."

The Petitioner testified that he told Counsel he was in drug treatment with Sanders, that Sanders was involved in the prescription scam, and that the Petitioner could identify Sanders. Next, the Petitioner identified a photograph of Sanders as the man who dropped him off at the Eckerd's. Further, the Petitioner testified that he informed Counsel that, although he had never actually met Stewart, he had previously gone with Sanders to Stewart's trailer in Bedford County, where Sanders

7

retrieved a prescription bottle with Stewart's name on it. The Petitioner testified that he saw Stewart and Sanders kissing good-bye, and could identify Stewart. The Petitioner then identified a photograph of Stewart.

The Petitioner testified that he informed Counsel that he knew how to contact Sanders and would do so, but that Counsel never requested that the Petitioner give him more information about finding Sanders. He said that when he informed Counsel that he could contact Sanders and set up a meeting, Counsel "jumped off onto something else." The Petitioner explained, "I told [Counsel] about what happened . . . he sat there and he listened to me. He would get up from his desk in his little socks with no shoes on, run down the hall, come back and start talking about something else totally different."

The Petitioner testified that Counsel never gave him a copy of the State's discovery response or other court documents, either in person or by mail. The Petitioner said that on June 14, 2001, he asked Counsel about the possibility of probation, and Counsel explained that probation was no longer an option. The Petitioner testified that Counsel later informed him that the State offered an agreed sentence of forty-eight years in exchange for his guilty plea. The Petitioner explained that he informed Counsel and the prosecutor that he had only picked up two of the prescriptions and would, therefore, accept six years on two counts, for a total of twelve years at forty-five percent. The Petitioner testified that the prosecutor laughed at this offer. The Petitioner testified that Counsel recommended that he accept the forty-eight-year offer, because, if found guilty at trial, the trial court would see to it that he spend the rest of his life in prison. The Petitioner testified that Counsel never explained the maximum or minimum sentences for his charges. The Petitioner testified that, until the morning of trial, Counsel was recommending that the Petitioner plead guilty and rely on the mercy of the court.

The Petitioner stated that he did not testify at trial because he lost a coin toss. The Petitioner testified that he thought the State had done a good job making it seem that the Petitioner had made up names to obtain prescriptions, and he thought that the jury needed to hear his side of the story. The Petitioner explained that, had he testified at trial, he would have told the jury that Sanders and he were acquaintances and that he had been buying pills from Sanders for two or three months prior to his arrest. He said that he would have also testified that he had never called in any of the prescriptions. The Petitioner testified that he understood that, despite losing the coin toss, he was not prohibited from testifying. He said that he remembered the trial court informing him of his right to testify and that he could not be prevented from testifying. The Petitioner explained, however, that he relied on Counsel for his legal assistance, and, therefore, the Petitioner felt bound by his agreement with Counsel that they would both abide by the outcome of the coin toss.

The Petitioner testified that, at the time of sentencing, he had been placed back on probation in Maury County for attempting to alter a prescription, and possession of drugs, but that, thereafter, he had not violated his probation. The Petitioner stated that he had met with his probation officer once a week, passed weekly drug screens, and maintained employment. The Petitioner testified that he informed Counsel of these facts. He said that, after his arrest, the Petitioner lived at the Place of

8

Hope treatment facility, where he stayed as an inpatient for sixty days and then remained at the facility halfway house as an outpatient.

The Petitioner testified that he kept Counsel informed of his progress in treatment and other aspects of his life, and even brought Counsel a letter from his rehabilitation facility, the Place of Hope. The Petitioner identified a letter from the Place of Hope. The letter, which was admitted into evidence, stated that the Petitioner had been an inpatient at the Place of Hope and had "demonstrated a good understanding of his addiction and the negative consequences of his drug abuse." The letter went on, describing the Petitioner as having a positive attitude and successfully completing the treatment program. The letter explained that the Petitioner had moved into the Place of Hope halfway house following his inpatient treatment and continued to attend counseling while at the halfway house. The letter stated that, although the Petitioner had begun to work while living at the halfway house, the Place of Hope staff felt his chosen career was "not conducive to his recovery efforts" and that the Petitioner "left the program against staff advice."

The Petitioner explained that he worked for seven or eight months while out on bond, first at a construction site, and then as a truck driver for the Cawley Container Corporation. The Petitioner identified a letter from Everett M. Cawley, II, at Cawley Container Corporation, which was admitted into evidence. The letter stated that the Petitioner had been employed as a truck driver from February to March of 2001. The letter stated that the company's truck drivers are "the face of the company," and they must be trustworthy and represent the company well. The letter stated that the Petitioner had all of these qualities and would be welcome to return to his employment.

The Petitioner testified that he had no contact with Counsel between his trial and his sentencing hearing. He said that he received no assistance or advice from Counsel when making his statement for the presentence report. Introduced into evidence, the Petitioner's statement in the presentence report stated that he had a drug problem, and he had picked up the prescription for Sanders. The Petitioner said that his prior criminal record was completely a result of his drug addiction and abuse. The Petitioner testified that, although he had been unsuccessful at rehabilitation in the past, he believed that his most recent attempt would have been successful.

The Petitioner explained that the Place of Hope was a treatment facility combined with a ministry, and that, while he was there, he had found God. The Petitioner went on, stating that the Place of Hope, not only treated his addiction, but also provided him with a plan that he could follow for his recovery. The Petitioner testified that Counsel was aware of his successes at treatment. Further, the Petitioner stated that Counsel did not inform him that the presentence report listed alternative sentencing or supervised probation as an option for his charges. He said that Counsel did not call any witnesses, other than the Petitioner, at the sentencing hearing, nor did Counsel seek a letter from his employer. The Petitioner testified that, at the time of his sentencing hearing, he had twelve charges pending in Maury County for obtaining a prescription by fraud.

The Petitioner testified that he remembered having his arraignment on April 5, 2001. The Petitioner testified that, as he recalled, it was June 14, 2001, not May 3rd, when the trial date was

9

set for June 19, 2001. The Court then clarified, and the Petitioner accepted, that the record reflected that his trial date was set on May 3rd. The Petitioner explained that he was unaware of this fact despite being present in the courtroom when the trial date was set. The Petitioner testified that between May 3, 2001, and June 14, 2001, Counsel made no effort to prepare the Petitioner for trial. The Petitioner testified, however, that Counsel did telephone the Petitioner to let him know he needed to appear in court on June 14th, but the Petitioner believed that this call came on June 13th. The Petitioner testified that it was possible that he could be wrong on some of the details surrounding his trial. Further, the Petitioner testified that he believed that he received a continuance slip on May 3, 2001, but the trial court clarified that continuance slips are never used in Circuit Court Part II.

The Petitioner testified that Counsel never discussed severing the Petitioner's charges, suppressing evidence, or any other issues regarding trial strategy or the Petitioner's defense. He said that, although he had prior criminal convictions, this was his first jury trial. The Petitioner testified that, having only completed the ninth grade, he has poor reading comprehension. The Petitioner testified that Counsel never spoke with him regarding the lesser-included charge of facilitation or any potential jury instruction request on the issue of facilitation. The Petitioner testified that Counsel represented him on his direct appeal. The Petitioner testified that Counsel did not discuss with him the possibility of raising the issue of a facilitation charge in the direct appeal.

Dr. Pamela Auble testified as an expert that she is a psychologist and she conducts psychological evaluations of personality, emotional function, addictive tendencies, and mental capabilities. Dr. Auble testified that she was hired to do an evaluation of the Petitioner's personality, as well as conduct intellectual and cognitive testing on the Petitioner. She said that the Petitioner's IQ was 83, which placed him in the bottom thirteenth percentile, but the Petitioner's verbal comprehension, 74, placed him lower, in the bottom fourth percentile. Dr. Auble explained that the Petitioner does not have a good vocabulary and may have difficulty understanding verbal communication and difficulty with verbal reasoning. Dr. Auble testified that the Petitioner possessed an average attention span and was low-average to average in his abilities to manipulate objects and space. She said that she determined the Petitioner was at a seventh grade reading level and that with his cognitive abilities, it could be difficult for him to understand the concepts and mechanics of a jury trial. Dr. Auble stated that the petitioner had previously been addicted to cocaine and had successfully conquered his cocaine addiction, but that the Petitioner had subsequently become addicted to pain killers. Dr. Auble testified that the Petitioner's health records indicated that he suffered from a long-term drug addiction, and his personality tests indicated that he was predisposed towards addiction.

Dr. Auble opined that the Petitioner needed a great deal of structure and support to successfully overcome his drug addiction. Dr. Auble testified that, based on her own evaluations and the testimony given by the Petitioner's family, the Petitioner was making progress at the time of his sentencing. She believed that the Petitioner would have continued to make progress had he been given the chance to continue his treatment program as it was prior to his incarceration. She testified that she was familiar with the guidelines for community corrections, and believed that an

appropriate community corrections program would have been a good option for the Petitioner. Dr. Auble testified that the Petitioner needed a treatment program that provided frequent drug screens, monitored the Petitioner closely, and allowed for continued employment. She stated that the Petitioner would have a better chance at recovery out of custody.

Dr. Auble said that the Petitioner had not been using drugs when she met with him in July of 2003, and he informed her he had not used drugs since he was incarcerated, which was two years before they met. Dr. Auble testified that, while prison is very structured and provides a lot of supervision, prison did not provide the kind of support that the Petitioner needed.

Based upon the foregoing evidence, the post-conviction court dismissed the Petitioner's petition for post-conviction relief, issuing oral and written findings explaining its decision. The court found that there was no evidence to support a facilitation instruction. The court stated, "[The Petitioner] was in the role of a principal, the one who went in to pick up the drugs, not in the role of a facilitator." Further, the court explained, assuming the evidence supported the lesser charge, it would be harmless error because the Petitioner participated in and benefitted from his participation in the crime. Similarly, the court held that if there was no evidence available to prove facilitation, then Counsel could not be ineffective for failing to present and argue this non-existent evidence.

The post-conviction court found that the Petitioner was not deprived of effective assistance at trial. Specifically, the court found that the Petitioner's testimony regarding the coin toss was not credible, but that Counsel's testimony was credible, "based on the demeanor of the two at the evidentiary hearing." As to Counsel's failure to investigate Sanders, Stewart, and Green, the post-conviction court found that there was no proof to establish that these people were involved in the prescription scheme and, therefore, no proof that any investigation would have benefitted the Petitioner. Similarly, the court found that Counsel's failure to interview the pharmacy employees did not harm the Petitioner. The court found that Counsel's decision to allow the doctors to testify by letter was reasonable under the circumstances, as counsel testified that the doctors were hostile toward the Petitioner, and the Petitioner failed to show that the doctors' in-person testimony would have changed the outcome at trial.

The post-conviction court found that the trial court had properly ruled on the admission of the Petitioner's prior criminal record. The court found that the convictions were for crimes of dishonesty and fell within the ten-year time limit. Further, the court noted, the trial judge conducted the balancing test and found that the probative value of these convictions outweighed the unfair prejudicial effect, provided that it was clear these convictions were not for the forgery of prescriptions.

As to the motions to suppress, the court found that the Petitioner abandoned his argument that Counsel should have filed a motion to suppress his statement, following the Petitioner's own testimony that he was not "very high" when he spoke to Agent Biele. The trial court also found that there was no harm in Counsel's failure to file a motion to suppress the physical evidence taken from the Petitioner at the time he was arrested. The court explained that there was probable cause for

11

Agent Biele to arrest the Petitioner, and therefore, the court would not have granted the motion to suppress this evidence. The post-conviction court found that there was no harm in Counsel's failure to file a motion to sever the Petitioner's twelve counts. The court determined that Counsel's strategy was reasonable. Additionally, the court concluded that the twelve counts were part of a common scheme or plan and that the evidence in each would have been admissible in the others; thus the court would not have granted a motion to sever.

The court found that the failure to request an investigator and a psychologist from the State did not prejudice the Petitioner, as there was no proof that either would have changed the outcome of the trial or sentencing. Additionally, the court found that the testimony at the post-conviction hearing established that Counsel spent adequate time preparing for the pre-trial and trial stages of the case.

The post-conviction court held that the Petitioner was deprived of effective assistance at sentencing. The court held, however, that Counsel's ineffective assistance did not prejudice the Petitioner, because, based on the facts and circumstances of the case, the trial court would have issued the same sentence regardless of Counsel's errors.

The Petitioner now appeals the court's dismissal of his petition for post-conviction relief. Specifically, he alleges that the post-conviction court erred because: (1) the trial court failed to instruct the jury on facilitation; (2) his counsel was ineffective at trial and on appeal; and (3) his sentence violates the Constitutional prohibition against cruel and unusual punishment.

## II. Analysis

### A. Standard of Review

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. Tenn. Code Ann. § 40-30-203 (1997). The trial judge's findings of fact on post-conviction hearings are conclusive on appeal unless the evidence preponderates otherwise. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). The trial court's findings of fact are afforded the weight of a jury verdict, and this court is bound by the trial court's findings unless the evidence in the record preponderates against those findings. Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997); Alley v. State, 958 S.W.2d 138, 147 (Tenn. Crim. App. 1997). This court may not re-weigh or reevaluate the evidence, nor substitute its inferences for those drawn by the trial judge. State v. Honeycutt, 54 S.W.3d 762, 766 (Tenn. 2001). Questions concerning the credibility of witnesses and the weight and value to be given to their testimony are resolved by the trial court, not this court. Burns, 6 S.W.3d at 461. The burden of establishing that the evidence preponderates otherwise is on the petitioner. Henley, 960 S.W.2d at 579. However, the trial court's conclusions of law are reviewed under a purely de novo standard with no presumption of correctness. Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

## B.  Failure to Charge Facilitation

The Petitioner contends that the trial court erred when it failed to charge the jury on the lesser-included offense of facilitation, because the evidence at trial was sufficient to support such a charge, thereby requiring the court to so instruct the jury.  The State counters that the Petitioner waived the instructional issue by failing to raise it on direct appeal.  Further, the State argues that even if the issue is not waived, the post-conviction court correctly found that the evidence did not support a facilitation instruction.  In a rebuttal brief, the Petitioner responds that the State waived the issue of waiver by failing to argue it at the post-conviction hearing.  We first address the dispositive issue of whether the Petitioner has waived the issue by not presenting it for consideration on direct appeal.

In State v. Townes, this Court addressed whether the petitioner's failure to raise, on direct appeal, the issue of the trial court's failure to properly instruct the jury, constituted a waiver of that issue for purposes of post-conviction relief.  State v. Townes, 56 S.W.3d 30, 35–37 (Tenn. Crim. App. 2000), *overruled on other grounds by* State v. Terry, 118 S.W.3d 355, 358 (Tenn. 2003).  In Townes, the petitioner argued that the trial court erred when it failed to instruct the jury on the defenses of necessity, accident, and self-defense.  The petitioner in that case had not raised these issues on direct appeal.  The State, in the post-conviction court and on appeal, argued that the petitioner waived this issue by failing to raise it on direct appeal.  This Court agreed, holding that, because the petitioner failed to raise the issue on direct appeal, he waived the issue.  Conversely, in State v. James Richard Perry, No. 03C01-9401-CR-00016, 1995 WL 433319 (Tenn. Crim. App., at Knoxville, July 24, 1995), *no perm. app. filed*, this Court held that, because the State failed to argue waiver at the trial court level, it was not required to hold that the petitioner's claims were waived.  This Court declined to base its decision on the petitioner's alleged waiver, stating, "[W]e decline to adopt the position of the State [on waiver] taken for the first time on appeal."  Perry, 1995 WL 433319 at *2.

The Post-Conviction Procedure Act provides for dismissal of any petition based on claims for relief that have been waived.  Tenn. Code Ann. § 40-30-206(f) (1997).  Tennessee Code Annotated section 40-30-206(g) (1997) states that "[a] ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented," with certain exceptions not applicable in the present case.  Tenn. Code Ann. § 40-30-106(g) (2003).

The Post Conviction Procedure Act provides strict rules and requirements for post-conviction proceedings.  The mandatory language of the Act requires that the trial court dismiss all claims based on issues that have been waived, are filed outside the statute of limitations, or have been previously determined.

Accordingly, we conclude that the Petitioner has waived the issue of the facilitation instruction because he failed to raise this issue on direct appeal.  The Petitioner, however, has also raised this issue in two separate claims for relief based on the ineffective assistance of counsel.

13

Specifically the Petitioner avers: (1) his Counsel was ineffective for failing to request a jury instruction on the lesser-included offense of facilitation; and (2) his Counsel was ineffective in not appealing the trial court's failure to instruct the jury on the lesser included offense of facilitation. Therefore, we will address the merits of the Petitioner's claim regarding the facilitation instruction in the context of his claim that he received the ineffective assistance of counsel at trial and on appeal.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. Id.; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). This right to representation includes the right to "reasonably effective" assistance. Burns, 6 S.W.3d at 461. The Constitution does not require that a criminal defendant receive the "best" counsel. "Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law." Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974); see also Baxter, 523 S.W.2d at 936 (adopting the criteria set forth by the Sixth Circuit in the Beasley opinion). The Tennessee Supreme Court has held that the issue of ineffective assistance of counsel is a mixed question of law and fact and, as such, is subject to de novo review. Burns, 6 S.W.3d at 461.

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. Baxter, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness," and that this performance prejudiced the defense, resulting in a failure to produce a reliable result. Strickland v. Washington, 466 U.S. 668, 687 (1984); Cooper v. State, 849 S.W.2d 744, 747 (Tenn. 1993). To satisfy the requirement of prejudice, a petitioner must show a reasonable probability that, but for counsel's unreasonable error, the fact finder would have had reasonable doubt regarding the petitioner's guilt. Strickland, 466 U.S. at 695.

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. Strickland, 466 U.S. at 690; State v. Mitchell, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. Strickland, 466 U.S. at 690; Cooper, 849 S.W.2d at 746; Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462. Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. Williams v. State, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980).

It is unnecessary for a court to address deficiency and prejudice in any particular order, or even to address both if the petitioner makes an insufficient showing on either. Strickland, 466 U.S. at 697. In order to establish prejudice, the petitioner must show that a reasonable probability exists that "'but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'"

14

Burns, 6 S.W.3d at 463 (quoting Strickland, 466 U.S. at 694).

It is counsel's responsibility to determine the issues to present on appeal. State v. Matson, 729 S.W.2d 281, 282 (Tenn. Crim. App. 1986) (citing State v. Swanson, 680 S.W.2d 487, 491 (Tenn. Crim. App. 1984)). Generally, this responsibility addresses itself to the professional judgment and sound discretion of appellate counsel. Porterfield v. State, 897 S.W.2d 672, 678 (Tenn. 1995). There is no constitutional requirement that every conceivable issue be raised on appeal. Campbell v. State, 904 S.W.2d 594, 597 (Tenn. 1995). Failure to raise an issue on appeal is not, however, exempt from claims of ineffective assistance of counsel. A petitioner may prove that counsel's failure to raise a certain issue on appeal constituted the ineffective assistance of counsel if the petitioner proves: (1) Counsel's failure to raise the issue was deficient performance; and (2) there is a reasonable probability that, if counsel raised the issue on direct appeal, this Court would have reversed his conviction and remanded his case for a new trial.

The first step in our analysis is to determine whether an instruction on facilitation was warranted. At the time of the Petitioner's trial, the trial court had a duty to instruct the jury on any lesser-included offenses of the charged offense when such instruction was supported by the evidence, regardless of whether the defendant had requested such an instruction. State v. Bowles, 52 S.W.3d 69, 74 (Tenn. 2001); Burns, 6 S.W.3d at 464. Whether an offense should be submitted to the jury as a lesser-included offense is a mixed question of law and fact. State v. Rush, 50 S.W.3d 424, 428 (Tenn. 2001). Our standard of review of the trial court's charge to the jury regarding lesser-included offenses is de novo with no presumption of correctness. Id.

If an offense is a lesser-included offense of the offense for which a defendant is charged, the court must ascertain whether the evidence justifies a jury instruction on the lesser-included offense. Bowles, 52 S.W.3d at 75. First, the trial court must determine whether there is evidence that "reasonable minds" could accept to establish the lesser-included offense. Burns, 6 S.W.3d at 469. In doing so, the trial court must view the evidence liberally in a light most favorable to the existence of the lesser-included offense without judging its credibility. State v. Ely, 48 S.W.3d 710, 722 (Tenn. 2001); Burns, 6 S.W.3d at 469. Then, the trial court must determine if the evidence is legally sufficient to support a conviction for the lesser-included offense. Burns, 6 S.W.3d at 469. The evidence, not the theories of the parties, determines whether an instruction on a lesser-included offense should be given. State v. Allen, 69 S.W.3d 181, 188 (Tenn. 2002). Furthermore, the decision to convict on a lesser-included offense should not be taken from the jury simply because the element distinguishing the greater offense from the lesser offense is "uncontroverted." Id. at 189. If the evidence justifies an instruction, the failure to charge the offense is error even though the evidence was also sufficient to support the greater offense. Burns, 6 S.W.3d at 472.

In the case under submission, there is evidence in the record that supports an instruction on the lesser-included offense of facilitation. Tennessee Code Annotated section 39-11-403 defines facilitation as follows:

A person is criminally responsible for the facilitation of a felony if, knowing that

15

another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony.

Tenn. Code. Ann. § 39-11-403(a) (1997).

The evidence presented at trial indicates that the Petitioner was arrested when he obtained a prescription that "someone" had fraudulently called into Eckerd's pharmacy. Eckerd's pharmacy telephoned Agent Biele and informed him that someone had come to pick up the fraudulent prescription. Thereafter, Agent Biele witnessed the Petitioner pay for and exit the pharmacy with the fraudulent prescription. Testimony at trial showed that the Petitioner admitted that he had obtained prescriptions, from the same pharmacy, on numerous occasions, using three different aliases. The testimony also showed, however, that the Petitioner claimed to know "Terry Sanders," and that it is not uncommon for people to pick up prescriptions for others. Further, the testimony showed that the Petitioner told Agent Biele that he was picking up the prescription for a friend, that this friend drove the Petitioner to the Pharmacy, and that this friend probably left after witnessing the Petitioner's arrest. The evidence showed that Agent Biele did not know whether there was anyone named Terry Sanders, Tammy Stewart, or Kevin Green in Bedford County. Although there was no evidence specifically implicating Terry Sanders, reasonable minds could have concluded that the Petitioner was guilty of facilitation based on the evidence at trial. Thus, we conclude that an instruction on the lesser-included offense of facilitation was warranted.

At trial, Counsel pursued a line of questioning that can be characterized as attempting to demonstrate that the Petitioner only picked up the prescription; that the Petitioner took no role in calling the prescription into the pharmacy, which is when the fraud in this case occurred. Thus, it appears that Counsel was trying to prove that the Petitioner was merely a facilitator of the felony, that the Petitioner lacked the intent required to commit the crime with which he was charged. Yet Counsel did not request that the trial court give the jury a facilitation instruction, or object to the instructions given. Further, Counsel has presented no evidence that the omission of this issue from the Petitioner's direct appeal was a strategic or tactical choice. This Court can find no reasonable explanation for Counsel's failure to raise the issue on direct appeal. The evidence preponderates against the trial court's finding, and, therefore, we conclude that both Counsel's failure to request an instruction on facilitation, and his failure to raise this issue on direct appeal, constitute deficient performance.

Next we must address whether the Petitioner suffered prejudice as a result of counsel's errors. This determination depends upon whether the failure to instruct the jury on facilitation is harmless error; if the error is harmless, Counsel's deficient performance did not result in prejudice to the Petitioner. The failure to instruct a jury on a lesser included offense is constitutional error, violating the fundamental right to a trial by jury. Allen, 69 S.W.3d at 191. Harmless error relating to constitutional errors, including the failure to charge lesser-included offenses, must be shown by the State "beyond a reasonable doubt." State v. Ely, 48 S.W.3d 710, 727 (Tenn. 2001). Harmless error may be shown where the jury convicts on the highest offense to the exclusion of the immediately

lesser offense, necessarily rejecting other lesser offenses. State v. Williams, 977 S.W.2d 101, 106 (Tenn. 1998). Harmless error, however, is not limited to the Williams rejection of an intermediate lesser offense; the proper inquiry is "whether it appears beyond a reasonable doubt that the error did not affect the outcome of the trial." Allen, 69 S.W.3d at 191. In making the harmless error determination, this court must "conduct a thorough examination of the record, including the evidence presented at trial, the defendant's theory of defense, and the verdict returned by the jury." Id.

The Petitioner was convicted of twelve counts of obtaining a prescription by fraud. The Petitioner's defense was that he only picked up one prescription, hoping that an admission of guilt on one count would lend credibility to his claims of innocence on the other eleven counts. The evidence at trial showed that the Petitioner was caught picking up a prescription that had been fraudulently called in. There was circumstantial evidence that linked the Petitioner to the other eleven prescriptions, including a piece of paper with three names, phone numbers, two doctors' names, and their respective DEA numbers. Further, there was testimony that the Petitioner confessed to calling-in the prescriptions and admitting that he did so in furtherance of his drug addiction. There was also evidence that the Petitioner was merely picking up the prescription for a friend, that this friend sent the Petitioner into the Pharmacy for the prescription, and then fled when the Petitioner was stopped by the police. As noted above, it appears that this evidence was relevant as to the issue of whether the Petitioner intended to participate in or benefit from the fraud by which the prescription was obtained. Because the issue of intent was contested, and the jury was not allowed to consider this issue in the context of the lesser-included offense of facilitation, we cannot conclude that the error was harmless beyond a reasonable doubt.

"A reasonable probability of being found guilty of a lesser charge, or a shorter sentence, satisfies the second prong in Strickland." State v. Zimmerman, 823 S.W.2d 220, 225 (Tenn. Crim. App. 1991). Thus, the Petitioner needs only to prove there is a "reasonable probability" that this Court would have ruled in favor of the Petitioner had Counsel raised this issue on appeal. The Petitioner has satisfied this burden. Consequently, Counsel's failure to appeal the facilitation instruction issue resulted in prejudice to the Petitioner. The judgement of the post-conviction court is reversed, the conviction is set aside, and the cause is remanded for a new trial.

### C. Other claims of Ineffective Assistance of Counsel

The Petitioner asserts that the post-conviction court erred when it dismissed his petition for post-conviction relief because his counsel was ineffective. As detailed above, to prevail on a claim of ineffective assistance of counsel, a petitioner must show that: (1) "counsel's representation fell below an objective standard of reasonableness;" and (2) this deficient performance prejudiced the defense, producing an unreliable result. Strickland v. Washington, 466 U.S. 668, 687 (1984).

### 1. The Coin-Toss Issue

The Petitioner claims that Counsel was ineffective because Counsel flipped a coin to determine whether the Petitioner should testify on his own behalf. At the post-conviction hearing,

Counsel testified that he did not recall a coin-toss, but that if any coin-toss was made, it "would have been to make a point, not to make a decision." Counsel submitted that any reference to a coin-toss would have been regarding how the jury would react to the Petitioner's testimony, given the State's ability to impeach the Petitioner with his numerous, prior felony convictions. The post-conviction court specifically found that Counsel's testimony was credible and that the Petitioner's testimony was lacking in credibility. Based on the testimony, the post-conviction court found that the decision about whether the Petitioner would testify was not made with a coin-toss.

The Petitioner has not shown that the evidence preponderates against the post-conviction court's findings. This Court may not re-weigh or re-evaluate the evidence, or substitute its inferences for those drawn by the trial judge. Honeycutt, 54 S.W.3d at 766. Questions concerning the credibility of witnesses and the weight and value to be given to their testimony are resolved by the trial court, not this court. Burns, 6 S.W.3d at 461. The burden of establishing that the evidence preponderates otherwise is on the petitioner. Henley, 960 S.W.2d at 579. At the post-conviction hearing, the Petitioner testified that Counsel informed him that the decision whether to testify was ultimately up to the Petitioner. The Petitioner explained that he understood that he could not be prohibited from testifying and that only he could decide whether to testify. Additionally, the Petitioner testified that he remembered the trial court specifically explaining his right to testify, and that he fully understood it was solely his decision. Therefore, we conclude that the evidence does not preponderate against the trial court's finding that Counsel was not ineffective in this regard.

### 2. Failure to Conduct Reasonable Investigation into Law or Facts of Case

The Petitioner contends that Counsel was ineffective because he failed to investigate the law or facts of the case. The post-conviction court found Counsel's testimony credible and determined that Counsel had adequately prepared for the Petitioner's defense. We cannot conclude that the evidence preponderates against the trial court's findings. At the post-conviction hearing, Counsel testified that he interviewed Agent Biele and spoke with the doctors whose DEA numbers the petitioner used. Counsel testified that he attempted to investigate Sanders, Stewart, and Green, but that the Petitioner failed to provide specific information with which he could locate any of these witnesses. Additionally, Counsel testified that he researched all the legal issues presented by the Petitioner's case.

Even if we were to conclude that Counsel's investigation of witnesses was ineffective, we could not hold that the Petitioner showed that Counsel's representation prejudiced him. "When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990); see also Scott v. State, 936 S.W.2d 271, 273 (Tenn. Crim. App. 1996).

> As a general rule, the only way a petitioner can establish that his trial counsel's assistance was ineffective is to prove that: (1) a material witness existed who could have been discovered but for counsel's negligent investigation of the case; (2) a

18

known witness was not interviewed; (3) the failure to discover or interview the witness caused him prejudice; or (4) the failure to present a known witness or call the witness to the stand resulted in the denial of critical evidence which caused the petitioner prejudice.

Black, 794 S.W.2d at 757. Neither the trial court nor this Court can speculate on what a witness' testimony might have been if introduced by counsel. Id.

In the case under submission, the Petitioner did not present testimony or affidavits from any witnesses to support his contention that, had these witnesses testified, the outcome of the trial would have been different. In fact, he presented no testimony or affidavits from any potential witnesses at all. Rather, he simply identified pictures of these individuals. Thus, the Petitioner has failed to prove that but for Counsel's actions or services, the outcome of the Petitioner's trial would have been different.

### 3. Failure to Develop a Reasonable Trial Strategy or Defense

The Petitioner next asserts that he is entitled to post-conviction relief because Counsel failed to develop a reasonable trial strategy or defense. Counsel testified that his trial strategy was to try all twelve counts of the indictment together, and to rely on the State's lack of proof in ten of the counts against the Petitioner. Counsel testified that he intended to use the Petitioner's admission of guilt as to two of the counts to show the jury that the Petitioner's claims of innocence were credible on the other ten counts. The post-conviction court found that Counsel had adequately prepared for the Petitioner's defense.

Under the facts and circumstances of the Petitioner's case, we cannot conclude that the evidence preponderates against the post-conviction court's ruling that Counsel's strategy was not ineffective. Although Counsel's strategy proved unsuccessful, an unsuccessful trial strategy is not necessarily an unreasonable one. The fact that a particular strategy or tactic hurt the defense does not, alone, support a claim of ineffective assistance. Deference is made for sound trial strategy if the choices are informed and based upon adequate preparation. See Hellard, 629 S.W.2d at 9. Accordingly, the Petitioner has failed to prove that the trial court erred when it found that Counsel's trial strategy did not constitute ineffective assistance.

### 4. Failure to File Motion to Sever

The Petitioner next contends that Counsel was ineffective because Counsel failed to file a motion to sever the Petitioner's twelve charges. The Petitioner asserts that had Counsel filed this motion, it would have been granted, resulting in a separate trial for each of the twelve counts of prescription fraud. The Petitioner contends that the evidence in the trial on count twelve—the count for which the Petitioner was originally arrested—would not have been admissible in the trials on the other eleven counts; thus, the State would have had no evidence in these trials, and the Petitioner

19

would have been acquitted. The State argues that any motion for severance would not have been granted; therefore, the Petitioner has failed to show ineffective assistance or prejudice. The post-conviction court found that Counsel made a strategic decision to try all twelve counts together, in order to bolster the Petitioner's credibility as to his innocence on ten of the counts by his admission of guilt on two of the counts. The post-conviction court also determined that a motion for severance would not have been granted under the facts and circumstances of the Petitioner's case.

The evidence does not preponderate against the trial court's finding that Counsel's failure to file a motion to sever was strategic. Further, the petitioner has failed to show prejudice. A motion for severance of offenses is a matter which addresses itself to the sound discretion of the trial court. State v. Furlough, 797 S.W.2d 631, 642 (Tenn. Crim. App. 1990). This court will not interfere with the exercise of this discretion unless it appears on the face of the record that the accused was prejudiced by the court's ruling. State v. Wiseman, 643 S.W.2d 354, 362 (Tenn. Crim. App. 1982). Whether severance should be granted "depends upon the facts and circumstances involved in the various crimes that are charged." State v. Morris, 788 S.W.2d 820, 822 (Tenn. Crim. App. 1990). Under Rule 14 of the Tennessee Rules of Criminal Procedure, "the defendant shall have a right to severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible upon the trial of the others." Tenn. R. Crim. P. 14(b)(1); see also Spicer v. State 12 S.W.3d 438,443 (Tenn. 2000). To avoid severance, both portions of the rule must be satisfied. State v. Hallock, 875 S.W.2d 285, 289 (Tenn. Crim. App. 1993). Decisions by trial courts to consolidate or sever offenses are reviewed on an abuse of discretion standard. State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999).

In this case, the post-conviction court examined the facts and circumstances of the Petitioner's case, and determined that, had Counsel filed a motion for severance, the court would have denied the motion because the Petitioner's twelve offenses were all part of a common plan or scheme. Accordingly, the Petitioner has not shown prejudice.

### 5. Failure to File Motion to Suppress Evidence

The Petitioner next contends that Counsel provided ineffective assistance by failing to file a motion to suppress the evidence against the Petitioner. Specifically, the Petitioner argues that Counsel should have filed a motion to suppress the slips of paper taken from the Petitioner at the time of his arrest and the statement the Petitioner gave to Agent Biele after his arrest. The State counters that Counsel was not ineffective in failing to file motions to suppress this evidence, but even if Counsel was ineffective, the Petitioner suffered no prejudice.

In Stephen Bernard Wlodarz v. State, No. E2002-02798-CCA-R3-PC, 2003 WL 22868267, at *6 (Tenn. Crim. App., at Knoxville, Dec. 3, 2003), *perm. app. denied* (Tenn. May 17, 2004), this Court stated, "[I]f arguable grounds exist to suppress incriminating evidence, then an attorney, as a zealous advocate for the client, should move to suppress that evidence." Where there are no arguable grounds to suppress, the attorney is not ineffective by refraining from filing a motion to suppress. Accordingly, the Petitioner has failed to show ineffective assistance of counsel in the

failure to file a motion to suppress.

The Petitioner has failed to prove that he received ineffective assistance of counsel or suffered prejudice as a result of Counsel's failure to file a motion to suppress. The Petitioner argues that Agent Biele did not have probable cause to arrest and search the Petitioner, and therefore, Counsel was ineffective in failing to file a motion to suppress the evidence obtained in the search incident to arrest or the statement given to Agent Biele as a result of the arrest. The Petitioner maintains that, had Counsel filed this motion, the trial court would have granted it, and as a result, the physical evidence and the Petitioner's statement would have been excluded as the illegal fruits of his arrest, thereby depriving the State of evidence against the Petitioner. Conversely, the State argues that Agent Biele did have probable cause to arrest the Petitioner, and the search, therefore was a valid search incident to arrest. The post-conviction court concluded that Agent Biele had probable cause to arrest the Petitioner, and, therefore, the evidence against the Petitioner was obtained incident to a valid arrest.

An officer may, without a warrant, arrest a person when a felony has been committed, and the officer has reasonable cause to believe that the person arrested committed it. Tenn. Code Ann. § 40-7-103(a)(3). Whether probable cause exists depends upon whether the facts and circumstances known to the officer were sufficient for a prudent person to believe that the individual had committed the offense. Beck v. Ohio, 379 U.S. 89, 91 (1964); State v. Downey, 945 S.W.2d 102, 106 (Tenn. 1997).

Based upon these facts and a thorough review of the entire record, we conclude that the evidence does not preponderate against the trial court's finding that the agent had probable cause to believe that a felony had been committed and that the Petitioner had committed that crime, making the Petitioner's arrest valid and the evidence validly obtained as a result of the arrest. Consequently, we hold that the Petitioner was not prejudiced by Counsel's failure to file a motion to suppress the evidence obtained incident to the Petitioner's arrest.

### 6. Failure to Argue Effectively Against the Admissibility of Prior Convictions

The Petitioner next asserts that Counsel was ineffective by failing to argue effectively against the admission of his prior convictions prior to trial. The Petitioner states that had Counsel argued effectively, the trial court would not have ruled that the Petitioner's previous convictions could be used to impeach him if he chose to testify at trial. The Petitioner asserts that he, then, would have testified on his own behalf.

As noted above, the Constitution does not require that a criminal defendant receive the "best" counsel. Criminal defendants are entitled to reasonably effective assistance. Burns, 6 S.W.3d at 461. "Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law." Beasley, 491 F.2d at 696; see also Baxter, 523 S.W.2d at 936 (adopting the criteria set forth by the Sixth Circuit in the Beasley opinion).

21

The record reflects that Counsel argued against the admissibility of the Petitioner's prior convictions prior to the Petitioner's trial. The trial court, using Rule of Evidence 609, determined that the Petitioner's prior convictions were felony convictions that involved crimes of dishonesty, for which the Petitioner was released within the ten-year limitation period. Further, the record reflects that, although the trial court ruled that the convictions were admissible, it placed limitations on the admission of the convictions to reduce their prejudicial effect on the jury. Accordingly, we cannot conclude that the Petitioner has proven that Counsel's representation fell below the standard of reasonableness demanded of criminal defense attorneys.

### 7. Failure to Adequately Represent the Petitioner at Sentencing

The Petitioner next submits that Counsel provided ineffective assistance during the sentencing phase of the Petitioner's trial, and the Petitioner suffered prejudice as a result of Counsel's ineffective assistance. The State contends that the Petitioner was not deprived of effective assistance, and that even if he had been, he failed to show that he suffered any prejudice. The post-conviction court concluded that the Petitioner was deprived of effective assistance of counsel during the sentencing phase of his trial, but that the Petitioner was not prejudiced by Counsel's errors. After a thorough review of the record, we conclude that the evidence does not preponderate against the post-conviction court's findings.

Counsel was aware that the Petitioner was facing a lengthy sentence. Yet, despite the gravity of this possibility, Counsel spent no time preparing himself or the Petitioner for the sentencing hearing. The Petitioner and Counsel both testified that the Petitioner had no contact with Counsel between his trial and sentencing. Counsel did not assist or advise the Petitioner in filling out his pre-sentence statement. Further, at the post-conviction hearing, numerous witnesses testified that they were all present and willing to testify on the Petitioner's behalf at the sentencing hearing. Counsel, however, did not call any witnesses on the Petitioner's behalf. Further, the transcript of the sentencing hearing reflects that Counsel was confused as to whether the Petitioner was convicted of a Class E or a Class D felony.[5] Accordingly, we agree with the post-conviction court that Counsel's representation during the sentencing phase of trial fell below the standard of reasonableness demanded of criminal attorneys. We also agree with the post-conviction court, however, that the Petitioner was not prejudiced as a result of Counsel's ineffective assistance.

The testimony at the post-conviction hearing showed that the Petitioner's witnesses would have testified that the Petitioner was battling a long-term drug addiction, but that the Petitioner seemed to be making progress in treatment prior to his sentencing hearing. The Petitioner's family further noted that the Petitioner seemed likely to succeed at rehabilitation, but admitted that the Petitioner had failed at rehabilitation on several past occasions. Further, the witnesses testified that

---

[5]More notably, when asked to explain his confusion at the post-conviction hearing, Counsel testified that he was "trying to squeeze an E in" because it would have resulted in less jail time, but Counsel conceded that the felony class is a matter of law and is not subject to dispute, and that it would be unethical to try and misrepresent the felony class to the trial court.

the Petitioner had been working and maintaining a good relationship with his family.

Dr. Pam Auble, a psychologist and expert on addiction and personality traits, testified, at the post-conviction hearing, that the Petitioner was predisposed to addiction and suffered from a long-standing addiction to drugs, but that, prior to the sentencing hearing, the Petitioner was making progress at rehabilitation. Dr. Auble testified that the Petitioner had previously, successfully "conquered" his addiction to cocaine, but explained that the Petitioner subsequently became addicted to and abused other drugs. Further, Dr. Auble testified that the Petitioner needed a very structured environment and a lot of support to overcome his addiction.

Other evidence that Counsel could have presented at the Petitioner's sentencing hearing included a letter from the Petitioner's employer and a letter from the Petitioner's rehabilitation center. The letter from Place of Hope stated that, despite the Petitioner's progress in treatment, he had taken employment that was counterproductive to his rehabilitation, and that he left the program early against medical advice. Additionally, the Petitioner's pre-sentence report showed that the Petitioner had numerous prior felony and misdemeanor convictions, and that the Petitioner had violated probation and parole on several prior occasions.

In light of this evidence, the post-conviction court determined that Counsel's representation had not prejudiced the Petitioner, as the trial court would not have granted his request for community corrections or alternative sentencing. The Community Corrections Act establishes a program of community-based alternatives to incarceration for certain eligible offenders. See Tenn. Code Ann. § 40-36-103 (2003). A defendant is eligible for participation in a community corrections program if the defendant satisfies several minimum eligibility criteria set forth at Tennessee Code Annotated section 40-36-106(a)(1)-(6). The Act does not provide that all offenders who meet these requirements are entitled to such relief. State v. Grandberry, 803 S.W.2d 706, 707 (Tenn. Crim. App. 1990).

In determining if incarceration is appropriate, a trial court may consider the need to protect society by restraining a defendant having a long history of criminal conduct, the need to avoid depreciating the seriousness of the offense, whether confinement is particularly appropriate to effectively deter others likely to commit similar offenses, and whether less restrictive measures have often or recently been unsuccessfully applied to the defendant. Tenn. Code Ann. § 40-35-103(1); see also State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); State v. Grigsby, 957 S.W.2d 541, 545 (Tenn. Crim. App. 1997).

A court may also consider the mitigating and enhancement factors set forth in Tennessee Code Annotated sections 40-35-113, -114 as they are relevant to the section 40-35-103 considerations. Tenn. Code Ann. § 40-35-210(b)(5); State v. Boston, 938 S.W.2d 435, 438 (Tenn. Crim. App. 1996). Additionally, a court should consider the defendant's potential or lack of potential for rehabilitation when determining if an alternative sentence would be appropriate. Tenn. Code Ann. § 40-35-103(5); Boston, 938 S.W.2d at 438. A trial court is in the best position to determine a defendant's amenability to community corrections because of its ability to observe the

defendant's demeanor and characteristics first hand. Grigsby, 957 S.W.2d at 547.

The trial court examined the Petitioner's pre-sentence report and determined that seven of the Petitioner's prior felony convictions placed him in the classification of a career criminal, with a sentence of twelve years at sixty percent, on each of the twelve counts. The trial court noted that the Petitioner had been unsuccessful with probation in the past, and had a history of failed attempts at rehabilitation. Additionally, the trial court noted that the Petitioner had an extensive criminal record and was sentenced for an offense committed while on probation. See Tenn. Code Ann. § 40-35-114 (b)(2)–(3).

Because the trial court considered the alternative sentencing factors and the possibility of community corrections, despite Counsel's failure to request these alternatives, the Petitioner has failed to satisfy his burden of proof that but for Counsel's ineffective representation, the outcome of the proceedings would have been different. The evidence does not preponderate against the post-convictions court's finding that the Petitioner was not prejudiced by Counsel's assistance

### D. Cruel and Unusual Punishment

The Petitioner's final argument is that the thirty-six-year sentence imposed by the trial court violates the constitutional prohibition against cruel and unusual punishment. The State counters that the Petitioner's sentence does not constitute cruel and unusual punishment. "The protection against cruel and unusual punishments afforded by the Eighth Amendment [to the United States Constitution] has defied precise delineation." Joseph G. Cook, *Constitutional Rights of the Accused* § 26:1, at 26-5 (3d ed.1996). In particular, the United States Supreme Court case of Harmelin v. Michigan, 501 U.S. 957 (1991), reflects disagreement concerning the extent to which the Eighth Amendment guarantees "proportionality" in noncapital cases. See also State v. Harris, 844 S.W.2d 601, 602 (Tenn. 1992) (the precise contours of the federal proportionality guarantee are unclear). Nevertheless, in Harris, 844 S.W.2d at 602–03, the Tennessee Supreme Court noted that article I, section 16 of the Tennessee Constitution is subject to a more expansive interpretation than the Eighth Amendment to the Federal Constitution and, accordingly, held that the Tennessee Constitution mandates a proportionality inquiry, even in noncapital cases.

In Harris, the Tennessee Supreme Court adopted a proportionality analysis by which courts initially compare the sentence imposed to the crime committed. Id. at 603 (citing Justice Kennedy's concurrence in Harmelin, 501 U.S. at 997–1009 (Kennedy, J., concurring in part and concurring in the judgment)). "Unless this threshold comparison leads to an inference of gross disproportionality, the inquiry ends—the sentence is constitutional." Id. The factors relevant in determining whether the sentence imposed for an offense raises an inference of gross disproportionality include:

> (1) the nature of the crime, including whether society views the crime as serious or relatively minor and whether the crime is violent or non-violent; (2) the circumstances of the crime, including the culpability of the offender, as reflected by his intent and motive, and the magnitude of the crime; and (3) the existence and

nature of any prior felonies if used to enhance the defendant's penalty.

State v. Smith, 48 S.W.3d 159, 171 (Tenn. Crim. App. 2000) (citing Solem v. Helm, 463 U.S. 277, 290–91 (1983)). "Factors relevant to the harshness of a penalty include the type of penalty imposed and, if a term of imprisonment, the length of the term and the availability of parole or other forms of early release." Id.

Examining the Petitioner's case under the analysis noted above, we do not believe the Petitioner's sentence is cruel and unusual punishment for his crime. The jury found that the Petitioner had surreptitiously copied DEA numbers from two doctors' prescription pads, then used these DEA numbers to fraudulently obtain prescription drugs on twelve separate occasions. The trial court classified the Petitioner as a career offender based on seven of his numerous prior felony convictions. As such, the Petitioner was subject to a sentence of twelve years at sixty percent for each of the twelve counts of prescription fraud, a Class D felony. Because the Petitioner has an extensive criminal record, consisting of eighteen prior felony convictions and multiple misdemeanor convictions, and the Petitioner committed the twelve counts at issue while he was on probation in another county; the trial court ordered the Petitioner's sentences to run consecutively in three groups of four, for a total of thirty-six years.

In State v. Smith, this Court held that a sixty-year sentence at 100%, under the Drug Free School Zone Act, was not grossly disproportionate to the appellant's conviction of possession of more than 0.5 grams of cocaine with intent to sell within a few blocks of a local elementary school. Smith, 48 S.W.3d 172–73. In Smith, the Court explained, "the severity of the appellant's punishment is the direct result not merely of an isolated instance of [the crime] but of a pattern of drug dealing evidenced by his seven prior convictions of felony drug offenses and his consequent status as a career offender." Like the appellant in Smith, the Petitioner here is not subject to a lengthy sentence based on one offense, but rather based on his numerous prior felony convictions and his consequential status as a career offender. Moreover, the Petitioner, unlike the appellant in Smith, is not subject to a lengthy sentence for a singular conviction, but rather for twelve separate counts of prescription fraud.

Considering the Petitioner's prior criminal convictions and his historically unsuccessful attempts at parole, probation, and rehabilitation, the Petitioner's sentence is not "grossly disproportionate" to his offense, and therefore does not constitute cruel and unusual punishment. The Petitioner's sentence is merely a representation of the "State's interest 'in dealing in a harsher manner with those who by repeated criminal acts have shown that they are simply incapable of conforming to the norms of society as established by its criminal law.'" Smith, 48 S.W.3d at 173 (quoting Rummele v. Estelle, 445 U.S. 263, 276 (1980) (holding a life sentence imposed after a third non-violent felony conviction did not violate the Eighth Amendment)). The Petitioner's sentence is not unconstitutional.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we reverse the post-conviction court's judgment, set aside the conviction, and remand the case for a new trial .

_____
ROBERT W. WEDEMEYER, JUDGE